**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **SHEET METAL, AIR, RAIL, AND TRANSPORTATION WORKERS NO. 33 YOUNGSTOWN DISTRICT COLLECTION AND ADMINISTRATION AGENCY, INC.,** ) ) ) ) ) ) ) **Plaintiff,** ) ) **v.** ) ) **TOTAL AIR SYSTEMS, LLC, et al.,** ) ) **Defendants.** ) | **CASE No.: 4:13CV1451** **MAGISTRATE JUDGE GEORGE J. LIMBERT** **MEMORANDUM OPINION AND ORDER** |

This matter is before the Court on the unopposed motion for partial summary judgment filed by Plaintiff Sheet Metal, Air, Rail, and Transportation Workers Local No. 33 Youngstown District Collection and Administration Agency, Inc. ("Plaintiff") against Defendant Total Air Systems, LLC ("Total Air") on March 14, 2014, ECF Dkt. #34, as well as on the motion for summary judgment filed by Defendant 5 Starr Service and Construction, LLC ("5 Starr") on March 14, 2014. ECF Dkt. # 33. Plaintiff filed its opposition brief to 5 Starr's motion for summary judgment on April 14, 2014. ECF Dkt. #36. No reply brief was filed. For the following reasons, the Court grants both Plaintiff's motion for partial summary judgment against Total Air and 5 Starr's motion for summary judgment.[1]

---

[1]The following evidence was before the Court for summary judgment purposes: two affidavits of Travis Hoskinson ECF Dkt. ##34-1, 36-1, the affidavit of Angelo LoCastro , ECF Dkt. #33-2, two affidavits of Timothy B. Myers, ECF Dkt. ##34-3, 36-2, the affidavit of Joseph Kondela, Esq., ECF Dkt. #34-3, the deposition transcript of Travis Hoskinson, ECF Dkt. #33-3, and the bill of sale between 5 Starr and Enterprise Fleet Management, ECF Dkt. #33-2.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff is a collection agency established under collective bargaining agreements ("CBA") for a number of multi-employer benefit funds. Affidavit of Travis Hoskinson, Business Agent for Sheet Metal, Air, Rail, and Transportation Workers Local No. 33 ("Hoskinson Aff."), ECF Dkt. #34-1, ¶6. Total Air is a signatory to a CBA with Sheet Metal, Air, Rail, and Transportation Association, Local Union No. 33, Youngstown District ("Local 33"), Hoskinson Aff. ¶ 4.

On July 2, 2013, Plaintiff filed a complaint against Total Air seeking fringe benefits, liquidated damages, and other costs accrued by Total Air during the years 2011 through 2013, pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. §185, and Sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA") of 1947, 29 U.S.C §§ 1145 and 1132. ECF Dkt. #1. On October 14, 2013, Plaintiff filed an amended complaint against Total Air and 5 Starr, Total Air's alleged alter-ego and successor, seeking the same relief. ECF Dkt. #14.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by

demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2541, 91 L.Ed.2d 202 (1986)(quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001)(citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,' " *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams*, 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are

3

genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir.2000).

### III. LAW AND ANALYSIS

#### A. Total Air

Pursuant to 29 U.S.C. 1145, employers obligated by a CBA to make contributions to a multi-employer plan must do so in accordance with the terms and conditions of said collective bargaining agreement. As a signatory to the CBA at issue in this case, Total Air is bound by its agreement with Local #33. The CBA obligates participating employers, like Total Air, to make regular fringe benefit payments to Plaintiff. CBA attached to Hoskinson Aff. at Ex. A, ECF Dkt. #34-1 at p. 24-32, Addendum F, captioned "Bonding/Benefit Language," §§ 3, 4.

Specifically, the CBA obligates Total Air to make contributions to Plaintiff within seven days following the close of each week. *Id.* Further, the CBA contemplates an employer's failure to make timely payment of contributions and provides a formula for calculating relief: any employer who fails to make timely payment owes liquidated damages equal to ten percent of the contributions owed plus two percent interest above the prime lending rate (compounded monthly) until paid, plus interest on all liquidated damages and delinquent contributions equal to twelve percent per annum until they are paid. *Id.*

First, the Court considers the contributions owed by Total Air. In 2012, Plaintiff conducted an audit of Total Air's records which revealed that Total Air owed contributions for the years 2011

4

and 2012 totaling $7,623.05. Affidavit of Timothy B. Myers, Administrator of Sheet Metal, Air, Rail, and Transportation Workers Local No. 33 Youngstown District Collection and Administration Agency, Inc. ("Myers Aff."), ECF Dkt. #34-2, ¶¶ 5-6. Total Air thereafter stipulated to this amount in a settlement agreement. Settlement Agreement dated May 31, 2013 attached to Myers Aff. at Ex. A, ECF Dkt. #34-2 at p. 4-7. Total Air has since continued to ignore its obligations. See Weekly Contribution Reports attached to Myers Aff. at Ex. B, ECF Dkt. #34-2 at 8-13, Myers Aff. ¶ 7. The weekly contribution reports show that from May 31, 2013 to July 5, 2013, Total Air failed to pay Plaintiff an additional $38,937.80 in contributions. Thus, taking the sum of this figure and the amount previously agreed upon in the settlement agreement, Total Air owes $46,560.85 in contributions. Myers Aff. ¶ 8. However, subsequent to the weekly contribution reports included in Exhibit B, Total Air and third parties paid $24,133.00 towards the contributions owed. Myers Aff. ¶ 9. Therefore, the net amount of outstanding contributions owed by Total Air is $22,427.85.

Next, the Court must calculate the liquidated damages owed by Total Air. According to the CBA, liquidated damages are equal to ten percent of the contributions owed plus two percent interest above the prime lending rate (compounded monthly) until paid. See CBA, Addendum 4, Section 4. Thus, pursuant to 2013 weekly contribution reports, Total Air owes $3,893.78 (ten percent of $38,937.80) in liquidated damages. Myers Aff. ¶ 10. Pursuant to the settlement agreement, Total Air agreed that it owes $5,223.70 for various late payments of contributions during 2011 through February 2013. Myers Aff. ¶ 11. In total, Total Air owes Plaintiff $9,117.48 in liquidated damages. Myers Aff.¶ 12.

Finally, Plaintiff cites 29 U.S.C. section 1132(g)(2) for the proposition that, in actions involving delinquent contributions, the Court must award reasonable attorney's fees and costs. ECF

5

Dkt. #34 at 5. In the settlement agreement, Total Air agreed that it owed $3,890.00 in auditing fees and $4,000.00 in attorney's fees for a prior audit. Myers Aff. Ex. A, ECF Dkt. #34. Also, in bringing the present action, Plaintiff incurred a $400.00 filing fee and additional $28,400.00 in attorney's fees through March 13, 2014. ECF Dkt. #34 at 5. Taken together, Total Air owes Plaintiff $3,890.00 in auditing fees and $32,400.00 in attorney's fees. *Id.*

Total Air has not provided any evidence to dispute Plaintiff's claim for contributions, liquidated damages, and attorney's fees and costs. Absent any evidence to dispute Plaintiff's claim, the Court concludes that no genuine issue of material fact exists regarding Total Air's liability pursuant to the CBA. Therefore, the Court grants Plaintiff's motion for partial summary judgment and orders Total Air to pay Plaintiff $22,427.85 for delinquent contributions, $9,117.48 for liquidated damages, $32,400.00 for attorney fees, $3,890.00 for audit costs, $400.00 for filing fees, for a total of $68, 235.33, as well as interest at the contractual rate established in the CBA.

### B.     5 Starr

Plaintiff alleges that 5 Starr is the alter ego and/or successor of Total Air and therefore liable for Total Air's obligations under the CBA. ECF Dkt. #14. The facts in the instant case, however, establish only a limited relationship between 5 Starr and Total Air. Although the Court recognizes that the two companies touch in several ways, the alter-ego doctrine as articulated by the Sixth Circuit requires substantially identical elements of each business. Similarly, in order to apply successor liability to a purchaser of assets, a plaintiff must demonstrate continuity of operation between the seller and the buyer. Plaintiff has failed to show that a genuine issue of material fact exists based upon the facts before this Court with respect to the factors and/or elements of either theory of liability.

6

### 1. Alter-ego doctrine

The parties agree that the rule of law announced in *Road Sprinkler Fitters Local Union v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012), governs the resolution of the alter-ego claim in this case. In *Dorn,* the union argued that two companies engaged in the same business in the same marketplace were alter-egos, and, therefore, the non-signatory alter-ego was liable under the terms of the collective bargaining agreement. The *Dorn* Court applied a multi-factor test, considering whether the two companies had substantially identical: (1) management, (2) business purpose, (3) operation, (4) equipment, (5) customers, (6) supervision, and (7) ownership, and whether there is evidence of an intent to circumvent the effects of the collective bargaining agreement. *Id.* citing *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336-37.

Evidence, or lack thereof, of an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status. *Id.* at 337. The *Dorn* Court described the test as a 'more relaxed, less exacting' application of the alter-ego doctrine applied '[i]n order to effectuate federal labor policies.' *Id.* The Court continued, "The analysis is flexible and 'no one element should become a prerequisite to imposition of alter-ego status; rather, all the relevant factors must be considered together.'" *Id.* at 794, quoting *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 582 (6th Cir.1986).

Applying the foregoing test, the Sixth Circuit ultimately affirmed the District Court's entry of summary judgment for an employer, even though the employer's business intersected with the business of another company in various ways. *Dorn*, 669 F.3d at 796. The plaintiff in *Dorn*, a union brought suit against two companies and their presidents alleging breach of an obligation of arbitration arising out of a collective bargaining agreement. *Id.* at 792. The second company was

7

actually a party to the collective bargaining agreement, but the company was defunct at the time of the suit and refused to arbitrate the union's grievances. As a result, the union included the defunct company's alleged alter ego in the suit. *Id.* The alleged alter ego was founded by the defunct company's lead salesman (and its owner's son) in the 1990s, but it did not begin operations until shortly before the now-defunct began having financial troubles. *Id.*

The Sixth Circuit considered the *Fullerton* factors: First, in regards to management, the Sixth Circuit found that even though some family members worked for both companies, they held different positions. *Id.* at 794-95. No family member held a managerial role in both companies, and so "the nature of the management structure in the two companies [was] not substantially identical." *Id.* Second, the Sixth Circuit found that the two companies' operations were not substantially identical since the companies were competitors. *Id.* at 795. Moreover, only two of the fourteen employees of the alleged alter ego worked for the defunct company at the time of its closing, so there was no real continuity of work force.

Third, the equipment the alleged alter ego began operations with was entirely its own, and the little equipment it eventually acquired from the defunct company was acquired through arms-length purchases, with the alleged alter ego as one of several buyers. *Id.* at 795-96. Fourth, the customer factor was unsupported by the facts since the alleged alter ego only shared nine out of its more than 250 customers with the defunct company. *Id.* at 796. Moreover, the alleged alter ego completed only two of the defunct company's unfinished projects and declined to take on another. *Id.*

Fifth, the intent factor was not supported by any evidence – i.e., there was no evidence the companies intended to shirk their obligations under the collective bargaining agreement. *Id.* Based

8

upon the paucity of evidence offered by the union, the *Dorn* Court affirmed the District Court's entry of summary judgment in favor of the defendants. *Id.*

The instant case shares similar facts to those in *Dorn* and, thus, supports the entry of summary judgment in favor of 5 Starr. First, the management structure of 5 Starr and Total Air is not substantially identical. Angelo LoCastro, the owner and manager of 5 Starr, had no previous relationship with Total Air, beyond a friendship with one of the owners. Affidavit of Angelo LoCastro ("LoCastro Aff."), ECF Dkt. #33-1, ¶¶ 18, 21. Mr. LoCastro explains in his affidavit that he was interested in starting a local business, and that his neighbors ran a successful residential heating, ventilation and air conditioning ("HVAC") company. *Id.* ¶ 4. Mr. LoCastro contacted Leonard Williams, a principal of Total Air, and Leonard's son, Todd Williams, who performed managerial functions at Total Air, to ask whether they believed a residential HVAC business would be profitable, since they ran a commercial HVAC business. *Id.* ¶ 5.

The Williamses informed Mr. LoCastro that their business was in trouble, but encouraged him to consider starting a commercial HVAC business. *Id.* ¶ 6.There is no dispute that the Williamses played important roles in the advent of 5 Starr, and that Mr. LoCastro relied upon their knowledge of the commercial HVAC business, as well as the knowledge and experience of at least two Total Air employees, in early stages of building the business.

In fact, LoCastro avers that he was reluctant to run a union shop, fearing that it would cause 5 Starr to be less competitive than non-union shops, but Leonard Williams encouraged Mr. LoCastro, to have 5 Starr become a signatory[2] to the CBA. *Id.* ¶ 8. Leonard Williams introduced Mr.

---

[2] 5 Starr ultimately became a signatory to the CBA. Mr. Hoskinson testified at his deposition that 5 Starr has met its obligations since Mr. LoCastro signed the CBA, and that union members have spoken favorably about Mr. LoCastro's management of 5 Starr. Hoskinson Depo. at pp. 57, 62-63.

LoCastro to Travis Hoskinson, Local 33's business agent, and was present during Mr. LoCastro's negotiations on behalf of 5 Starr with Local 33. *Id.* ¶ 11.

Mr. LoCastro concedes in his affidavit that he hired Todd Williams as an employee at 5 Starr, at Leonard Williams' request, in order to grow the commercial side of the HVAC business. Todd Williams left 5 Starr and is now employed at a local car dealership. *Id.* at ¶ 24. Ralph Delio, a principal of Total Air, was hired for his Ohio mechanical contractor's license. The license is Delio's personal property, not the property of Total Air. *Id.* Mr. LoCastro also concedes that Leonard Williams provides consulting services to 5 Starr. *Id.* ¶ 11. However, there is no evidence to suggest that Leonard Williams, Todd Williams or Ralph Delio performed any managerial functions at 5 Starr.

Accordingly, although similar to *Dorn* in that there is some overlap in employment between the two companies, there is no evidence that the management structure of the two companies is substantially identical. In *Dorn*, the Court focused on the fact that the individuals held different positions in the two companies and that no one played a managerial role in both. *Dorn,* 669 F.3d at 794-95. The same is true in the case *sub judice.* Moreover, according to the testimony of Mr. Hoskinson, Total Air, at its peak, employed roughly twenty-two individuals, while 5 Starr employs only five employees. Hoskinson Depo. at 62.

Second, in regard to business purpose, 5 Starr confines its work to heating, ventilation, and air conditioning, while Total Air also performs sheet metal fabrication work. LoCastro Aff.¶ 25.

Third, with respect to operations, there was some overlap in 5 Starr and Total Air's business at 5 Starr's inception. 5 Starr's office was located in the same building as Total Air. In fact, Mr. Lo Castro admitted to "using some of Total Air space and paying rent for using space to the landlord

10

since Total Air [was] unable to meet their rental obligations." LoCastro Aff. ¶ 17. Likewise, during the first few weeks following 5 Starr's commencement of service, Steve Sexton, a service technician and former Total Air employee, used Total Air forms on service calls for a three week period. It is important to note that both of these situations occurred only at the early stages of 5 Starr's business.

Plaintiff also argues that 5 Starr uses a similar fringe benefit reporting form to Total Air, Myers Aff. ¶¶ 4-6, and that no other signatory to the CBA prior to Total Air had used such a form. *Id.* at ¶ 7. Plaintiff attached one of these forms from each company to its opposition brief for comparison, underscoring the fact that each has a similar calculation error that Mr. Myers attributes to a formula error in the accounting program. *Id.* at ¶ 9. The use of the reporting form is ongoing. LoCastro defends the reporting forms arguing that they are not the same as Total Air's or its leftover forms; they are merely formatted similarly because the forms used by Total Air are so "simple and efficient." LoCastro Aff. ¶ 27. Moreover, LoCastro attests that all of 5 Starr's accounting is kept in its own books in its own accounting program. *Id.*

In addition to the forgoing facts, Plaintiff relies upon two statements in Mr. LoCastro's affidavit: Mr. LoCastro states his intention of "obtaining accounts that will need someone to do their work once Total Air is out of business" and to avoid "reinventing the wheel since [he] was hiring tenured employees in the HVAC business and any administrative processes [Total Air] already had experience doing every day." LoCastro Aff. ¶ 7.

Although Plaintiff offers its most compelling alter-ego arguments with respect to the operation element of the *Dorn* test, the foregoing facts, interpreted as one part of the larger *Dorn* test, do not establish a genuine issue of material fact regarding 5 Starr's alleged alter-ego status. The standard announced in *Fullerton* and cited by *Dorn* requires the operations of the two companies

11

to be "substantially identical" to support an alter ego finding, and while there is an overlap in the two companies' operations, particularly at 5 Starr's inception, the operations are not substantially identical with Total Air. See *Dorn*, 669 F.3d at 794.

Fourth, with respect to equipment, 5 Starr concedes that it uses some of the same equipment (specifically vehicles) as Total Air, but notes that these vehicles were never owned by Total Air. LoCastro Aff. ¶ 22. Rather, these vehicles were owned by Enterprise Fleet Management, and when Total Air defaulted on the vehicles payments, 5 Starr bought the vehicles outright from Enterprise. *Id.* Plaintiff argues that 5 Starr used Total Air's vehicles prior to the vehicle purchase from Enterprise. In other words, 5 Starr used the vehicles when they were in Total Air's possession and control, prior to Total Air's default.

Fifth, Mr. LoCastro asserts that 5 Starr has a different customer base from Total Air. LoCastro Aff. ¶ 23. More specifically, Mr. LoCastro avers, "Nor are 100% of our customers a result or inheritance of Total Air. True, we do service some Total Air customers, but class [sic] my hard work 5 Starr has developed a different client base with people who never did business with Total Air." *Id.* Although Plaintiff argues in its brief that sixty percent of 5 Starr's customers are former Total Air customers, the record does not bear out this assertion. In fact, Plaintiff has failed to produce any evidence to show that Mr. LoCastro's testimony with respect to his customer base is the subject of a factual dispute.

When Total Air went out of business, there is not dispute that 5 Starr solicited Total Air's customers. However, Local 33's business agent conceded that soliciting a failing companies' customers was an ordinary business practice. Hoskinson Dep. at 48 -48.

12

Sixth, with respect to supervision and ownership, the two companies are different. 5 Starr was founded by LoCastro, is owned by LoCastro, and follows LoCastro's will. LoCastro Aff. ¶ 21. LoCastro admits to receiving guidance and surrounding himself with experienced employees, but this is distinguishable from supervision. *Id.* at ¶¶ 10, 12. LoCastro ultimately controls the destiny of the company, but he, like all owners, must at times rely on the advice and help of others. Plaintiff has not offered any evidence to refute LoCastro's assertions.

Seventh, Plaintiff has offered no evidence that 5 Starr intended to avoid any obligations under the CBA. Mr. Hoskinson concedes 5 Starr has substantially complied with all the requirements of the CBA. Hoskinson Depo. at 57. Further, LoCastro alleged that, when 5 Starr was purchasing assets from Total Air, he worked closely with his attorney to ensure that the assets were legally acquired. LoCastro Aff. ¶ 12.

Having considered the evidence offered in support of each of the factors listed in *Dorn*, the Court finds that the facts do not create a genuine issue of material fact regarding 5 Starr's relationship to Total Air. In *Dorn*, the Sixth Circuit affirmed the entry of summary judgment for defendants, even when a familial relationship existed between the leadership of the two companies. 669 F.3d at 796. *Dorn* articulated a high standard for the imposition of alter-ego status, which Plaintiff is unable to meet in this case. Accordingly, summary judgment is appropriate on Plaintiff's claim to the extent that it is predicated on the alter-ego doctrine.

### **2.** **Successor liability**

In addition to alleging that 5 Starr is the alter ego of Total Air, Plaintiff alleges that 5 Starr is also a successor of Total Air. However, Plaintiff's claim regarding 5 Starr's successor liability is largely ignored by 5 Starr in its motion for summary judgment. Rather than explicitly disputing the

successor allegation, 5 Starr conflates its analyses of the alter ego and successor liability doctrines. 5 Starr writes that "in 2012 [in *Dorn*] the Sixth Circuit made the law clear on alter-ego/successor in interest cases regarding breach of an obligation arising out of a collective bargaining agreement." 5 Starr thereafter fails to mention successor liability again. Nonetheless, the Court finds that 5 Starr's motion for summary judgment is well-taken since 5 Starr implicitly refutes any successor liability in its alter-ego analysis.

Under the theory of successor liability advocated by Plaintiff, "a purchaser of assets may be liable for delinquent ERISA fund contributions to vindicate important federal statutory policy" [3] when two elements are established: (1) notice by the buyer of the seller's liability; and (2) sufficient evidence of continuity of operations between the buyer and seller. *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 99 (3rd Cir. 2011); *Upholsters' International Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir.1990). Further, to determine continuity of operations, the courts look to the following factors: continuity of workforce; management; equipment and location; completion of work orders begun by the predecessor; and constancy of customers. *Id.*

---

[3]"The general rule of corporate successorship accepted in most states is nonliability for acquiring corporations, with the following exceptions: The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company." *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 259 (6th Cir.2012) ("[A] successor corporation generally is not liable for its predecessors liabilities unless expressly assumed.").

However, federal courts beginning with *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S. Ct. 414 (1973) have developed the foregoing federal common law successorship doctrine imposing liability upon successors beyond the confines of the common law rule when necessary to protect important employment-related policies. The *Golden State* Court acknowledged that "striking a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee[s] to effectuate national labor policy "is often a difficult and delicate responsibility." *Id.* at 181 (citations and quotations omitted.)

In determining whether a new company is a successor, the focus is on the totality of the circumstances of a given situation. Factors such as whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (analyzing successor liability for purposes of labor obligations). Under this approach, factors examined include: "Whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987) (discussing successor employer's obligation to bargain with the union). No one factor is dispositive. *Id.*

The Third Circuit observed that, on one hand, the federal standard is more expansive than the common law rule of successor liability because it does not require commonality of ownership between the seller and buyer for the continuance analysis. On the other, the federal standard is narrower than the common law because it requires that a successor be put on notice before the assumption of debt follows. *Einhorn* at 98.

Insofar as numerous federal courts, including district courts in the Sixth Circuit have applied the federal common law standard in the federal labor law arena[4], this Court will consider Plaintiff's

---

[4] A number of other circuit and district courts have extended the *Golden State* rationale in actions seeking recovery of delinquent pension fund contributions under ERISA after an asset sale. See *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir.1998) ("[a]lthough developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the LMRA"); *Stotter Div. of Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers*, 991 F.2d 997, 1002 (2d Cir.1993) (arbitrator did not

claim as argued under the federal common law standard. First, Plaintiff correctly argues that a factual dispute is present as to the first element of the successor liability test regarding notice. 5 Starr – and specifically its owner, Mr. LoCastro – took various precautions during the creation of the business to draw a distinction between 5 Starr and Total Air, and the fact-finder could reasonably infer that these precautions are evidence that 5 Starr had notice of Total Air's obligations under the CBA. LoCastro made efforts to clarify that Leonard Williams, a principal of Total Air, was only a consultant in his interactions with the Union's business agent. LoCastro Aff. ¶ 11. Further, LoCastro hired an attorney to ensure that everything he was doing was legal in his company's purchase of Total Air assets. *Id.* at ¶ 12. Moreover, Plaintiff interprets LoCastro's admission that "[he] realized they [Total Air] were having issues and that this may be a great way for [him] to possibly acquire assets and even accounts that Total Air did business with . . ." as proof that LoCastro had notice of Total Air's liability for delinquent contributions. ECF Dkt. #36 at 9 (quoting LoCastro Aff. 5, ECF

---

exceed his authority by imposing liability on the successor-employer for delinquent contributions owed under the predecessor's CBA with a union); *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289 (9th Cir.1987) (in wake of an asset sale, the court followed the substantial continuity test for determining successor liability for delinquent contributions); *Bd. of Trs. of Unite Here Local 25 v. MR Watergate LLC*, 677 F.Supp.2d 229, 231–32 (D.D.C.2010); *Cent. Pa. Teamsters Pension Fund v. Bear Distrib. Co. Inc.*, No. 07-CV-3554, 2009 WL 812224, at *8 (E.D.Pa. Mar. 26, 2009) (adopting the Artistic Furniture standard in an analogous case); *Trs. of the Utah Carpenters & Cement Masons Pension Trust v. Daw, Inc.*, No. 2:07-CV-87 TC, 2009 WL 77856, at *3 (D.Utah Jan.7, 2009) (finding buyer liable for seller's withdrawal liability under ERISA); see also 14 Fletcher, Cyc. Corp. § 6755 ("federal courts in the labor law field have taken a far more liberal approach [than the common law] in imposing the obligations of a seller of assets on the purchaser ... [including] where the predecessor had failed to meet its payment obligations under a multiemployer plan") (citations omitted).

The Sixth Circuit had the opportunity to apply the federal common law successorship doctrine most recently in *McCollum v. Life Ins. Co. of North America, 495 Fed. Appx. 694* (6th Cir.2012), but declined to consider it because it was not asserted by the parties. Several courts in the Sixth Circuit have applied successor liability in ERISA cases. *See e.g., Schilling v. Interim Healthcare of Upper Ohio Valley, Inc.*, 2008 WL 2355831 (S.D. Ohio June 9, 2008); *Bennett v. Gilbert*, 1998 U.S. Dist. LEXIS 16804 (W.D.Mich. September 17, 1998), the court analyzed the factors set out in *Artistic Furniture*, noting that successor liability promotes "Congressional intent to protect [ERISA] plan participants and their beneficiaries." Id. at *5.

Dkt. #33). Yet, alternatively, "having issues" could have been a reference to Total Air going out of business.

However, even if a factual dispute exists as to the first element of the successor test, if no genuine issue of material fact exists as to the second, summary judgment must be granted. The second element, regarding substantial continuity of operations between buyer and seller, was addressed and discredited in 5 Starr's alter-ego analysis. Although the alter-ego test, asking whether the companies are "substantially identical," is a more rigorous test than the "continuity" test for successor liability, 5 Starr nonetheless indirectly addresses the second element of successor liability in its alter-ego analysis.

As previously stated, the federal common law test looks to continuity of workforce, management, equipment and location, completion of work orders begun by the predecessor and constancy of customers. Here, there is no continuity of management, as Mr. LoCastro had no relationship with Total Air, and the Williamses and Mr. Delio do not hold management positions at 5 Starr. In fact, Todd Williams no longer works at 5 Starr. Likewise, the evidence before the Court establishes that Total Air was a much larger operation, employing as many as twenty-two individuals at its zenith, while 5 Starr employs only five individuals.

Next, although 5 Starr uses the same equipment as Total Air, it was purchased through an arms-length transaction with a third-party. Finally, but for Mr. LoCastro's averment that 5 Starr's customer base is not comprised exclusively of former Total Air customers, there is no evidence before the Court regarding the actual number of former Total Air customers serviced by 5 Starr or statistics showing the actual percentage of 5 Starr's business is represented by former Total Air customers. There is also no evidence of any completion of Total Air work orders by 5 Starr.

17

Because there is limited evidence of continuity of operations between Total Air and 5 Starr, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact exists with respect to 5 Starr's alleged successor liability.  Accordingly, summary judgment is appropriate on Plaintiff's successor liability claim.

## IV. CONCLUSION

The Court hereby grants both Plaintiff's unopposed motion for partial summary judgment against Total Air, ECF Dkt. #34, and Defendant 5 Starr's motion for summary judgment against Plaintiff, ECF Dkt. #33. Judgment is entered in favor of Plaintiff and against Total Air in the amount of $68,235.33, representing $22,427.85 for delinquent contributions, $9,117.48 for liquidated damages, $32,400.00 for attorney fees, $3,890.00 for audit costs, and $400.00 for filing fees, as well as interest at the contractual rate established in the CBA.  Furthermore, judgment is entered in favor of Defendant 5 Starr and against Plaintiff on Plaintiff's claims predicated upon the alter-ego and successor liability doctrines.

IT IS SO ORDERED.

DATE: June 18, 2014                    /s/  *George J. Limbert*
                                       GEORGE J. LIMBERT
                                       UNITED STATES MAGISTRATE JUDGE